Argued and submitted April 28, affirmed August 3, 2005

## KLAMATH COUNTY,
*Petitioner,*

*v.*

## DEPARTMENT OF TRANSPORTATION,
Burlington Northern
and Santa Fe Railway Company,
*Respondents.*

108652; A124664

116 P3d 924

Reginald R. Davis argued the cause and filed the briefs for petitioner.

Stephanie S. Andrus, Assistant Attorney General, argued the cause for respondent Department of Transportation. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Robert Walkley argued the cause for respondent Burlington Northern and Santa Fe Railway Company. With him on the brief was Gibson Kinerk LLP.

Before Edmonds, Presiding Judge, and Linder* and Wollheim, Judges.

EDMONDS, P. J.

---

* Linder, J., *vice* Ceniceros, S. J.

## EDMONDS, P. J.

■ Petitioner Klamath County seeks judicial review of an administrative order of the Oregon Department of Transportation (ODOT) that ordered the closure of a railroad grade crossing[1] Klamath Falls. The proposed crossing closure is vigorously opposed by the local community; Klamath County adopted a resolution opposing the closure of the grade crossing and offered to pay half the cost of constructing an overpass. In addition, 1,853 residents of the county signed a petition opposing the closure. On review, the county argues that ODOT did not have statutory authority to order the closure without the county's approval and that there is not substantial evidence to support ODOT's finding that the public health and safety requires the closure. After considering the county's arguments in light of the applicable law, we affirm.[2]

Several statutes relate to ODOT's authority over railroad grade crossings. ORS 824.202 establishes the state's policy in that regard:

> "It is the policy of this state to achieve uniform and coordinated regulation of railroad-highway crossings and to eliminate crossings at grade wherever possible. To these ends, authority to control and regulate the construction, alteration, and protection of railroad-highway crossings is vested exclusively in the state, and in the Department of Transportation as provided in ORS 824.200 to 824.256."

ORS 824.206(1)(b) implements that policy by authorizing ODOT to "[a]lter or abolish any grade crossing" if that action "is required by the public safety, necessity, convenience and general welfare." The statute also authorizes ODOT to require "a separation of grades at any such crossing."

---

[1] A grade crossing is a place where a railroad track and a road or highway cross each other on the same plane.

[2] The scope of our review is limited by the authority given to us by the legislature. ORS 183.482(8). Under that grant of authority, we do not review the merits of ODOT's decision; rather, we decide whether ODOT interpreted the applicable statutes correctly and whether the agency's order is supported by substantial evidence in the record made at the hearing before the agency.

In light of the above statutes, we turn to the evidentiary record in this case. The Burlington Northern & Santa Fe Railway (BNSF)[3] has a rail yard at Klamath Falls that it uses to hold trains for crew changes and other purposes, to break up trains, and to build trains. Trains enter and leave the yard at its north and south ends on the main line. Many of the yard's activities require significant switching of railcars among the various tracks in the yard. Just north of where the yard tracks end, the Midland Highway, state route 420, crosses the railroad's main line. The crossing is protected by automatic warning lights and by gates that prevent vehicle movement on the road over the tracks when the gates are down. The automatic crossing protection is activated when trains block the crossing as they leave or enter the yard. In addition, the switching of train cars often activates the crossing protection gates and causes them to come down, even if a train does not actually block the tracks.

The route of Midland Highway follows several different streets and roads before and after the crossing in issue. It runs south from the central area of Klamath Falls on Washburn Way until Washburn Way reaches LaVerne Avenue. The highway then turns west and follows LaVerne Avenue for about eight tenths of a mile. The grade crossing at issue is on LaVerne Avenue. West of the LaVerne Avenue crossing, the highway turns south on Tingley Lane. Shortly afterwards, Tingley Lane intersects with State Highway 140 at the South Side Bypass. The closing of the crossing will require motorists who wish to access the area west of the crossing to connect with State Highway 140 and then proceed to the South Side Bypass and then north on Tingley Lane and then east on LaVerne Avenue. That route is about 1.6 miles farther than using the crossing in issue. The additional travel time to use the route caused by the closure of the crossing is between one and one-half and two and one-half to five minutes, assuming that the crossing is not blocked by a train; if it is, the agency found that the longer route is likely to be faster.

---

[3] Subsequent to ODOT's order, BNSF changed its official name to BNSF Railway.

Near the junction of LaVerne Avenue and Tingley Lane and west of the grade crossing are several small businesses, many of whose customers presently use LaVerne Avenue to get to the businesses. In addition, a significant amount of through traffic uses LaVerne Avenue and Tingley Lane to travel from Washburn Way to the Bypass or south on Tingley Lane. Because of the amount of traffic, the intersection of Tingley Lane and the Bypass is one of the most dangerous in the state. Between 1986 and 2003, there were 99 crashes at that intersection that resulted in either serious injuries or fatalities. Vehicle movements north to south on Tingley Lane accounted for 31.5 percent of the crashes, while vehicle movements south to north on Tingley Lane accounted for 51 percent of the accidents. The intersection is currently protected by a flashing red light controlling the north-south traffic on Tingley Lane. ODOT does not believe that installing traffic signals would reduce the number of accidents.

For a number of years, BNSF, at the recommendation of the Federal Railway Administration, has had a program of closing grade crossings; it currently closes between 400 and 700 private and public grade crossings a year. Since it began the program in 1995, train collisions at grade crossings have decreased from 5.4 collisions per million train miles to 2.89 collisions per million train miles. Closing a grade crossing eliminates the risk of collisions with vehicles, bicycles, and pedestrians. A grade crossing, like the one at issue, that does not cross the road at a 90-degree angle, is especially dangerous because of limited sight distances and poor angles. A nearby hill and the yard office also affect the ability of approaching motorists to see activity on the tracks near the crossing in this case. There were six train-vehicle accidents at the LaVerne Avenue crossing between 1970 and 1996.

BNSF has significantly increased its rail traffic through Klamath Falls since 2002, resulting in longer trains and greater delays at grade crossings. Activity in the yard and arriving and departing trains frequently activate the protection at the LaVerne Avenue grade crossing. Records from one week in February 2003 and one week in March 2003 show that those movements activated the gates between 38 and 77 times during a 24-hour period, and that the total time

of activation during each 24-hour period varied from one hour and 22 minutes to 4 hours and 31 minutes. In addition, a waste treatment facility is currently being constructed next to the rail yard; when completed, it will have rail access and will result in eight to 16 additional activations per day. Each use of the crossing requires the engine involved to sound its air horn, frequently subjecting employees walking about the yard to loud noises. The frequent activations result in some motorists, in apparent anger or frustration, driving around the gates; others turn around in the rail yard parking lot, endangering employees who may be present.

If the grade crossing is closed, ODOT will install cul-de-sacs on the highway on each side of the crossing.[4] The cul-de-sac west of the crossing would make it easier for large trucks to maneuver, thus benefitting at least two of the nearby businesses. All of the nearby businesses would remain accessible from Tingley Lane. None of those businesses relies on drive-by traffic. ODOT believes that the risk of delay to emergency vehicles by the extra distance and travel time is probably offset by the risk of delay at present from trains or switching moves blocking the crossing when emergency vehicles need to use it. At present, emergency vehicles avoid the LaVerne Avenue crossing when the crossing gates are activated, but they are often unable to determine if that is the situation until after they turn onto LaVerne Avenue from Washburn. ODOT also believes that closing the crossing, thus ending the use of LaVerne Avenue and Tingley Lane as a through route, will substantially reduce accidents at the intersection of Tingley Lane and the Bypass.

Based on those facts, ODOT concluded that closing the LaVerne Avenue crossing satisfied ORS 824.206(1)(b). It reasoned that the reduced risk of collisions, both at the crossing itself and at the intersection of Tingley Lane and the Bypass, showed that public safety required the closure. In addition, the existence of an alternative route that did not require crossing the tracks at grade, together with the delays involved from the frequent closures at the LaVerne Avenue grade crossing and the benefits to the businesses west of the

---

[4] BNSF will pay for the cost of the cul-de-sacs.

crossing from the cul-de-sac, showed that, on balance, public necessity and convenience required closure. Also, in ODOT's view, closing the crossing would provide more certainty to routes taken by emergency vehicles.

■         The county first assigns error to ODOT's conclusion that it had the authority to close the grade crossing without the county's approval. The county relies on ORS 366.290(3), which provides:

> "With the written consent of the county in which a particular highway or part thereof is located, the department may, when in its opinion the interests of the state will be best served, eliminate from the state highway system any road or highway or part thereof. Thereafter the road or highway or part thereof eliminated shall become a county road or highway, and the construction, repair, maintenance or improvement, and jurisdiction over such highway shall be exclusively under the county in which such highway or road is located."

The premise of the county's argument is that the Midland Highway is a state highway and that the closing of the crossing will eliminate the part of the highway that is within the crossing from the state highway system. Under OAR 741-120-0050(2) and (4), ODOT will remove the road surface within the crossing, and BNSF will remove the crossing protection, once the crossing is closed. According to the county, that result, without the county's approval, runs afoul of ORS 366.290(3). The county also relies on *Cabell et al. v. Cottage Grove et al.*, 170 Or 256, 130 P2d 1013 (1943), in which the Supreme Court held that ODOT's predecessor did not have the authority, as part of maintaining a state highway that ran through the city, to shut off access to the highway from intersecting city streets.

■         When required to interpret a statute, our task is to ascertain the legislature's intent underlying the statute. That analysis begins with a consideration of the text and context of the statute. Unless defined by the statute itself or some other statute, the words in a statute are given their ordinary meaning. By its terms, ORS 366.290(3) applies only when ODOT "eliminates" a state highway from the highway

system. One definition of to "eliminate" is to "cause the disappearance of, esp. as a factor or element in a process or situation; get rid of[.]" *Webster's Third New Int'l Dictionary* 736 (unabridged ed 2002). When a state highway is eliminated as part of the state highway system, the highway becomes a county road and the county becomes responsible for its "construction, repair, maintenance or improvement." When the statute is read as a whole, it is evident that the phrase "eliminate from the state highway system" does not refer to road *closures*, but rather to circumstances in which responsibility for the road is transferred from the state to the county. In fact, the statute presumes that, after "elimina[tion] from the state highway system," the road will continue to be—or at least could be—used as a road:

> "Thereafter the road or highway or part thereof eliminated *shall become a county road or highway, and the construction, repair, maintenance or improvement, and jurisdiction over such highway shall be exclusively under the county in which such highway or road is located.*"

(Emphasis added.) The purpose of the statutory requirement for a county's written consent, as is obvious from its text, is to prevent the state from foisting the responsibility for maintaining a road onto a county over the county's objection. That consent requirement simply has no application where a road has been closed and does not "become a county road or highway."

    In this case, the closing of the LaVerne Avenue crossing will not turn the portion of the highway that formerly passed over the tracks into a county road; rather, that portion will no longer be passable by nonrail vehicles of any sort. The road on each side of the crossing will remain a state highway, even if the two portions are no longer parts of a through route. We conclude that ORS 366.290(3) does not apply to the circumstances of this case, because the portion of highway within the crossing will not be eliminated from the state highway system in a way that causes it to be become a county road for which the county is responsible. In addition, ODOT does not propose to close any streets that are not state highways, which was the issue in *Cabell*. That case, therefore, is also inapposite. Because ORS 366.290(3) does not

apply to the above circumstances, ODOT has the authority to order the LaVerne Avenue crossing closed despite the county's opposition.[5]

■    The county's second assignment of error is that there is not substantial evidence to support ODOT's decision to close the grade crossing. The county points to evidence in the record that, it believes, should have led ODOT to reach a different conclusion. Our review under ORS 183.482(8)(c), however, is for whether there is substantial evidence to support ODOT's findings; we do not review those findings *de novo*. *See Garcia v. Boise Cascade Corp.*, 309 Or 292, 787 P2d 884 (1990). None of the evidence that the county discusses challenges the findings that ODOT made.

Relying on the language of ORS 824.206(1)(b), the county also appears to argue that ODOT's findings are legally insufficient because they do not show that the closing of the grade crossing is absolutely *required*. The dictionary provides several possible definitions for "require." The two definitions that are most relevant to this issue are "to call for as suitable or appropriate in a particular case" and "to demand as necessary or essential." *Webster's* at 1929. The first definition is the one that ODOT appears to have relied on in its order; the second is the one that the county appears to rely on in its argument. A consideration of the context in which the statute uses the word "required" shows that ODOT correctly concluded that the legislature intended the first definition, not the second, when it authorized ODOT to close railroad crossings.

ORS 824.206(1)(b) provides that ODOT "may," if "such action is required by the public safety, necessity, convenience and general welfare," "[a]lter or abolish any grade crossing or change the location thereof, or require a separation of grades at any such crossing." Providing that ODOT "may" take certain action if that action "is required" is an

_____

[5] The county's formal resolution in opposition to the closure and the petition from county residents to the same effect are evidence for ODOT to consider in determining whether the closure will satisfy the statutory standards. Contrary to the county's apparent suggestion, they are not binding on ODOT. ODOT did consider the resolution and the petition and explained the weight that it gave to them as part of its overall consideration of the issues under the applicable statutes.

inherently inconsistent statement if "required" means "necessary or essential." There cannot be agency discretion whether to take an action if that action is absolutely essential. That inconsistency in itself suggests that the word "required" has a different meaning in this context than that advocated by the county. In addition, the legislature authorized ODOT to take a range of actions if it decided to make changes to a grade crossing: it could alter the crossing, it could abolish it, it could change its location, or it could require a separation of grades.[6] If the legislature used "require" in its absolute sense, when the facts "require" one action, they cannot require another. That is again inconsistent with the legislature's clear recognition that the same facts could support a decision *either* to close the crossing *or* to separate the grades, such as by building an overpass.

In ORS 824.202, the legislature established a public policy in favor of eliminating railroad grade crossings wherever possible. Under that statement of policy, ODOT is to use the criteria in ORS 824.206(1) to determine when it is possible to eliminate a crossing—or, at least, to make it safer—by one of the methods that the legislature described. To hold that ODOT must find that closure is absolutely essential before it can act is inconsistent with the legislature's express purpose and is neither suggested nor required by the words that it used. We conclude that, when the legislature instructed ODOT to find that the criteria "require" it to take some action, it meant that ODOT must find that those criteria make the action "suitable or appropriate" under the circumstances of the particular case.

■  Given this understanding of the statute's language, it is clear that there is substantial evidence to support ODOT's conclusion that the closing of the LaVerne Avenue grade crossing is required within the meaning of ORS 824.206(1)(b). The evidence of frequent and increasing interference with vehicular traffic from trains and switching

---

[6] ORS 824.206(1)(a), (c), and (d) provide additional options. We note that, when the legislature authorized ODOT to "require" a separation of grades, it used the term in a third sense, "to impose a compulsion or command upon (as a person) to do something[.]" *Webster's* at 1929.

movements, the accompanying dangers from frustrated drivers either evading the crossing protection or turning around in an unsafe fashion, the uncertainties currently facing emergency vehicles, the existence of a convenient and safe alternative route, and the reduced risks of accidents at the dangerous Tingly Lane/Bypass intersection all support the agency's decision.

Affirmed.